## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-60091

United States Court of Appeals
Fifth Circuit

**FILED**
March 26, 2019

Lyle W. Cayce
Clerk

GREAT AMERICAN LIFE INSURANCE COMPANY,

  Plaintiff

v.

AVA MITCHELL TANNER,

  Defendant - Appellee

v.

ALITA MARGARET MITCHELL; CRAIG J. CHEATHAM,

  Defendants - Appellants

Appeals from the United States District Court
for the Northern District of Mississippi
USDC No. 3:16-CV-70

Before DAVIS, JONES, and DENNIS, Circuit Judges.

PER CURIAM:*

Great American Life Insurance Company ("Great American") filed this interpleader action seeking to determine who was the proper beneficiary of two

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-60091

annuities belonging to decedent Don Mitchell ("Don").  The district court granted summary judgment in favor of Don's daughter, Ava Tanner ("Ava"), the appellee in this case, and rejected the claim of Don's widow, Alita Mitchell ("Alita"), and her son, Craig Cheatham ("Craig"), the appellants.  Because we find that issues of fact are presented, we vacate the summary judgment and remand this case for further proceedings.

## BACKGROUND

### I.  Factual Background

Don was first married to Barbara Mitchell, and three daughters were born from this marriage, one of whom was Ava.  In 1984, Don and Barbara divorced.  In 1987, Don remarried Earlene Cotton White, and they lived together in Heth, Arkansas until Earlene's death in 2005.  In 2007, Don's daughter Ava, who had been medically disabled since 2001, moved to Heth, Arkansas to be near her father.

In 2011, Don began communicating with Alita, the widow of one of Don's boyhood friends, Pete Cheatham.  This was their first contact in approximately forty years.  About a month later, Don began visiting Alita at her home in Horn Lake, Mississippi.  Eventually, Don and Alita began to discuss marriage.

In 2011, Don had a number of medical setbacks, and Ava was Don's caregiver during these illnesses.  In early 2012, Don had surgery to remove a spot from the side of his head.  In March 2012, shortly after Don's surgery, Ava traveled to Florida to care for her mother, who was also recovering from surgery.  Ava returned to Arkansas in August of that year to find her father's health had declined further.  In November 2012, Don was diagnosed with stage IV lung cancer and began receiving chemotherapy and radiation, which took a further toll on his health.

In April 2013, Don retired after years of working as a boat captain on the Mississippi River.  Because he had trouble keeping up with his bills and bank

2

No. 18-60091

accounts, Don added Ava to his bank accounts and asked her to help pay his bills.  When Don retired, he moved his 401k account to Regions Bank ("Regions") and with some of that money, purchased two annuities from Great American through Regions.  Those two annuities, in the amounts of $117,333.54 and $120,153.25, are the subject of this litigation.

Ava was listed as a beneficiary on the Great American annuities.  There was some conflict in the summary judgment evidence about discussions between Ava and Alita concerning Don's financial affairs.  Ava stated that Alita wanted to help Don get his financial affairs in order and sought a copy of his will.  Ava contended that Don told her he did not want Alita to have a copy of his will.  Alita, on the other hand, testified during her deposition that she never asked for a copy of the will and was not concerned with Don's financial affairs.  Alita testified that Don expressed concern about what Ava was doing with his money.

In March 2015, Ava left for Florida again to care for her mother, but she testified that she called to check on her father almost daily.  She took with her two folders including information about Don's Great American annuities, the receipt for his burial policy, and a checkbook.  Ava offered to return to Arkansas in the summer of 2015, but Don and Alita told her that was not necessary.

At some point, Don asked Alita's son, Craig, for assistance locating information about his finances, and Craig initially told Don that he did not want to get involved.  Don allegedly complained that Ava would not give him specific information he requested about his finances, except to tell him that it was in his computer.  Several months later, Don asked Craig to assist him in locating his trust account, but Craig declined and told him he should see his lawyers. Some time later, Don asked Craig to come to his home and meet with him, and in early August 2015, Craig met with Don.  While at Don's house,

3

## No. 18-60091

Craig and Don discussed Don's desire to marry Alita. Don also told Craig that he suspected that his children were stealing from him and expressed concerns about Ava's refusal to return the documents he had requested or give him information on where his trust was located. Don asked Craig for help finding his trust account. Craig agreed to go with Don the following week to speak with a trust attorney in Little Rock regarding Don's trust.

Don also asked Craig to go with him to Regions to get a copy of his bank statements. They went to Regions on August 12, 2015. While there, Don told Craig that his account had less than $18,000, when the previous month, he had $58,000 in his money market account and $8,000 in his personal account. Bank officials told Don that he had active checking accounts in Alabama, Florida, and four in Arkansas. Don informed bank officials that he had no knowledge of Alabama or Florida accounts and was only aware of three of the four accounts opened in Arkansas. While at the bank, Don closed all but one of the accounts. Don believed that Ava had forged his name on the other accounts. Don became very upset about this turn of events and believed that Ava had ruined him.[1]

After Don and Craig's first meeting in early August, Don asked Craig to go with him to Regions and meet with Scottie Lackland, the branch manager, about Don's investments. This was when Craig learned about the Great American annuities. On August 14, 2015, Don signed forms revoking Ava's power of attorney and appointing Craig in her place. Don called attorney Frank Dudeck's office to have him prepare the necessary forms. Craig then went, without Don, to the attorney's office to get these documents. After

---

[1] It is certainly not clear from this record that Ava was indeed mishandling Don's money. While Alita and Craig argue that Ava withdrew Don's money to purchase items for her mother (Don's ex-wife), and Regions branch manager Scottie Lackland confirmed that several thousand dollars were transferred from Don's account to an account in Florida that Ava set up, Ava contends that Don had given her permission to make these expenditures.

No. 18-60091

receiving the power of attorney, Craig faxed his power of attorney and Ava's revocation to Great American, asking them to freeze the accounts until they heard further from him.

On August 17, 2015, Don returned to Regions with Alita and Craig. At that time, Don made Alita the primary beneficiary of the Great American annuities. A couple of weeks later, Great American wrote Don asking him to clarify whether Alita should be a co-owner or beneficiary of the policies. In response, the policies were changed at Don's request to name Alita as a co-owner and Craig as the primary beneficiary. Great American then wrote Don still another letter informing him that Alita could not be a co-owner on the annuities, only a beneficiary. The annuities were then amended for a third time to reflect Alita as the primary beneficiary and Craig as the contingent beneficiary. After leaving Regions on August 17, 2015, Don and Alita were married in a small ceremony. Ava was not notified about the wedding.

After Don and Alita were married, Ava stated that she was unable to speak with her father because Alita changed Don's telephone number and did not give it to her. Alita denied this and testified that she gave Don's new cell phone number to Ava. On December 1, 2015, Don died at the age of 81.

## II. Procedural Background

On April 5, 2016, Great American filed this interpleader complaint to determine whether Ava, Alita, Craig, or anyone else was the proper recipient of the two annuities issued to Don before his death. Alita filed a crossclaim against Ava, Ava filed a crossclaim against Alita and Craig, and all three answered Great American's complaint. Ava's crossclaim alleged that Alita and Craig exerted undue influence over Don to persuade him to make the changes to his beneficiary designations. Ava alleged that Alita and Craig exerted undue influence over Don by telling him that Ava had been stealing his money; threatening to end Don's relationship with Alita unless he moved to Horn Lake

5

No. 18-60091

with Alita; and limiting Don's contact with his family members, including Ava. In May 2017, Alita and Craig filed a motion for summary judgment, and Ava filed a cross motion for summary judgment.

The district court granted partial summary judgment in favor of Ava on the issue of undue influence and entered a judgment in the amount of $228,767.94. Alita and Craig appealed, and the district court entered an order designating its judgment as a final judgment pursuant to Federal Rule of Civil Procedure 54(b).[2]

## STANDARD OF REVIEW

This court reviews a district court's grant of a motion for summary judgment de novo.[3] Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[4] In other words, we must determine whether "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party," or "whether the evidence . . . is so one-sided that one party must prevail as a matter of law."[5] In reviewing a summary judgment grant, we must "construe all facts and inferences in favor of the nonmoving party."[6]

---

[2] The district court's Rule 54(b) order brought appellants' notice of appeal into effect. *Crowley Mar. Corp. v. Pan. Canal Comm'n*, 849 F.2d 951, 953-54 (5th Cir. 1988). As set forth in the district court's Rule 54(b) order, the district court has not yet ruled on Ava's claim for treble damages, which claim is to be considered on remand.

[3] *Deshotel v. Wal-Mart La., L.L.C.*, 850 F.3d 742, 745 (5th Cir. 2017) (citation omitted).

[4] FED. R. CIV. P. 56(a).

[5] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-52 (1986).

[6] *Deshotel*, 850 F.3d at 745 (citing *McFaul v. Valenzuela*, 684 F.3d 564, 571 (5th Cir. 2012)).

No. 18-60091

This court reviews de novo a district court's interpretation of state law and is bound to resolve the issue as the state's highest court would.[7]  In this diversity case, this court applies the substantive law of Mississippi.[8]

## DISCUSSION

Under Mississippi law, undue influence is exerted where a beneficiary's intent is substituted for the intent of the grantor.[9]  It is well established that, "where a confidential relation exists between a [grantor] and a beneficiary under his will, and the beneficiary has been actively concerned in some way with the preparation or execution of it," courts apply a presumption of undue influence that the beneficiary must then rebut by clear and convincing evidence.[10]

The district court concluded that Craig exerted undue influence on Don and that Craig failed to rebut the undue influence presumption by clear and convincing evidence.[11]  Reasoning that undue influence makes the entire

---

[7] *Troice v. Proskauer Rose, L.L.P.*, 816 F.3d 341, 345 (5th Cir. 2016) (citation omitted) (quoting *Occidental Chem. Corp. v. Elliott Turbomachinery Co.*, 84 F.3d 172, 175 (5th Cir. 1996)).

[8] *See First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009) (citation omitted).

[9] *See Estate of Johnson v. Johnson*, 237 So. 3d 698, 711 (Miss. 2017) (citation omitted).

[10] *See Croft v. Alder*, 115 So. 2d 683, 686 (Miss. 1959).

[11] In so ruling, the district court seems to have held Alita and Craig to an improperly high standard at the summary judgment stage.  The district court required appellants to rebut the undue influence presumption by clear and convincing evidence, but at the summary judgment stage, the court should only have required them to show the presence of some genuine issue of material fact as to whether they could rebut this presumption.

7

No. 18-60091

transfer voidable under Mississippi law, the district court declined to address whether Alita exerted an undue influence over Don.[12]

## I. Presumption

The district court concluded that the circumstances surrounding Don's decision to make Craig and Alita beneficiaries of the annuities gave rise to a rebuttable presumption of undue influence because Craig and Don had a confidential relationship and Craig was involved in the preparation of the change-of-beneficiary forms. On appeal, appellants contend that the district court improperly weighed and resolved disputed fact issues.

### Confidential Relationship

Under Mississippi law, a confidential relationship is "a relationship between two people in which one person is in a position to exercise dominant influence upon the other because of the latter's dependency upon the former, arising either from weakness of the mind or body, or through trust."[13] The Supreme Court of Mississippi considers several factors in determining whether a confidential relationship exists: (1) whether one person must be cared for by others, (2) whether one person maintains a close relationship with another, (3) whether one person provides transportation and medical care for another, (4) whether one person maintains joint accounts with another, (5) whether one person is physically or mentally weak, (6) whether one person is advanced in age or poor in health, and (7) whether there is a power of attorney between one person and another.[14]

---

[12] We also do not reach the question whether Alita exercised undue influence over Don because the district court did not decide it in the first instance. That question is to be decided at trial on remand.

[13] *Estate of Johnson*, 237 So. 3d at 710 (quoting *Foster v. Ross*, 804 So. 2d 1018, 1022-23 (Miss. 2002)).

[14] *Estate of Holmes v. Holmes-Price*, 961 So. 2d 674, 680 (Miss. 2007) (quoting *Wright v. Roberts*, 797 So. 2d 992, 998 (Miss. 2001)).

No. 18-60091

On the facts of this case, Don and Craig had a confidential relationship. First, Don required assistance and care from others as his health declined. Second, Don and Craig became close quickly, and Don trusted Craig to assist him with his financial affairs. Craig testified that when he went to Don's home to assist him for the first time, they talked for "two to three hours," and Don confided in him about his children, his finances, and his "concerns." Over the next few months, Craig assisted Don with other personal matters, including his financial matters. Third, Craig testified that he transported Don to the bank to make changes to his accounts. Fourth, Don maintained his own accounts, and Ava was co-owner and had access to some of them. Fifth and sixth, Don was 81 years of age, had stage IV cancer, and was physically weak. Finally, as to the seventh factor, Craig was appointed power of attorney over Don's affairs. Assessing these factors overall, we conclude that the district court correctly concluded that Craig and Don had a confidential relationship.

### Beneficiary Involvement

In addition to having a confidential relationship with Don, Craig must have been actively concerned in some way with changing the beneficiaries on the annuity forms in order to give rise to the undue influence presumption.[15] In *Croft*, the Supreme Court of Mississippi found the presumption applied when the beneficiary was actively involved in the preparation and execution of his uncle's will: the beneficiary made frequent trips from out of state to assist his uncle, who was in poor physical condition; asked a third party to prepare the will on his uncle's behalf; and was present when his uncle signed the will.[16]

Like the beneficiary in *Croft*, the evidence in this case supports a finding that Craig was actively involved in the beneficiary change. Craig went to

---

[15] *See Croft*, 115 So. 2d at 686.
[16] *See id.* at 684, 688-89.

9

Regions with Don on August 12, 2015, and Craig learned of the annuities around this time. Craig lived some sixty-five miles from Don's home and drove this distance each time he met with Don. Craig went alone to Don's attorney's office to pick up documents to appoint Craig power of attorney. On August 14, Don signed forms granting Craig power of attorney. Craig then faxed his power of attorney to Great American and asked them to freeze the accounts until it heard further from him. On August 17, Craig brought Don to Regions, where Don made Alita the primary beneficiary of the annuities, replacing Ava. A few weeks later, upon Great American's request for clarification, Craig assisted Don with completing the paperwork to name Alita as a co-owner and Craig as the primary beneficiary of the annuities. Craig subsequently assisted Don with amending the forms a third time to reflect that Alita should be primary beneficiary and Craig contingent beneficiary.

The summary judgment evidence shows there is no genuine factual dispute as to the undue influence presumption. Craig and Don had a confidential relationship, and Craig was actively involved in changing the beneficiaries of the annuities. Therefore, the district court did not err in applying the presumption of undue influence.

## II. Rebutting the Presumption

The critical issue in this appeal is whether the summary judgment evidence raises an issue of fact as to whether Craig and Alita can rebut the undue influence presumption. A presumption of undue influence may be rebutted if a beneficiary establishes the following by clear and convincing evidence: (1) "[g]ood faith on the part of the grantee/beneficiary;" (2) the grantor had "full knowledge and deliberation of his actions and their consequences; and" (3) "the grantor/testator exhibited independent consent

No. 18-60091

and action."[17]  The evidence used to rebut the presumption must come from a source other than the beneficiary or other interested parties.[18]

The Supreme Court of Mississippi has explained the analysis of whether the undue influence presumption has been rebutted as follows:

> Excluding the testimony of the grantee, those acting in the grantee's behalf (such as the attorney), and any others who could have a direct or indirect interest in upholding the transfer (such as grantee's family), is there any other substantial evidence, either from the circumstances, or from a totally disinterested witness from which the court can conclude that the transfer instrument represented the true, untampered, genuine interest of the grantor? If the answer to this question is yes, then it becomes a question of fact whether or not there was undue influence. If the answer is no, then as a matter of law the transfer is voidable.[19]

Appellants have presented, as rebuttal evidence, the testimony of three, independent, disinterested witnesses: Scottie Lackland (the Regions branch manager who assisted Don with the initial change-of-beneficiary paperwork), Tarishan Winder (who notarized the third change-of-beneficiary form), and Stephen Jones (who worked for Don's lawyer, Frank Dudeck).  Ava concedes that these witnesses were likely disinterested but argues that their testimony provides only a "brief snapshot" of events during the longer period over which the changes took place.

## Good Faith

The Supreme Court of Mississippi has set forth five factors for consideration in determining whether a beneficiary acted in good faith: (1) "the determination of the identity of the initiating party in seeking preparation of the instrument," (2) "the place of the execution of the instrument and in whose

---

[17] *Estate of Holmes*, 961 So. 2d at 680 (first quoting *Murray v. Laird*, 446 So. 2d 575, 578 (Miss. 1984); then quoting *Mullins v. Ratcliff*, 515 So. 2d 1183, 1193 (Miss. 1987)).

[18] *See id.* at 681.

[19] *Id.* (quoting *Pallatin v. Jones*, 638 So. 2d 493, 495 (Miss. 1994)).

presence," (3) "what consideration and fee were paid, if any," and (4) "by whom paid," and (5) "the secrecy or openness given the execution of an instrument."[20]

The first factor is the most significant in this case. Testimony from disinterested witnesses shows Don initiated the change in beneficiary on the annuities. First, Stephen Jones, who worked for Dudeck, testified that Don's understanding of how he wanted to dispose of his property and assets came from "[h]imself." Jones additionally testified that he wasn't aware that Dudeck was ever concerned about Don's competency or that Dudeck contemplated that someone had tried to subvert Don's will. Tarishan Winder, the notary, stated that Don "understood what he was signing and was not influenced or coerced in any way in executing the documents on September 26, 2015." Finally, Scottie Lackland, the Regions branch manager, stated that the beneficiary change was Don's idea, that Don was not subject to any undue influence in making that choice, and that Don led the meeting that day.

Next, under the second and fifth factors, the first change of beneficiary form was executed openly at Regions in the presence of Scottie Lackland, Alita, and Craig. It is unclear from the record where the subsequent changes to the forms were completed, who was present, or whether those changes were done in the open. Finally, as to the third and fourth factors, the district court correctly noted that there is no evidence in the record that any consideration was paid by any party.

The witness testimony creates a fact issue as to whether Craig was carrying out Don's wishes to name his wife-to-be, Alita, as the primary beneficiary of Don's annuities, after Don repeatedly requested Craig's

[20] *Id.* at 682 (citation omitted) (quoting *Murray*, 446 So. 2d at 578).

No. 18-60091

assistance with his finances.  This evidence is sufficient to create a genuine fact issue as to whether Craig acted in good faith.[21]

## Knowledge and Deliberation

We next turn to the second requirement, which asks whether Don acted with knowledge and deliberation of his actions and their consequences when he removed Ava as beneficiary of the annuities and added Alita and Craig.[22] In this analysis, Mississippi courts examine four factors: (1) the grantor's "awareness of his total assets and their general value," (2) whether the grantor understood who the "natural inheritors of his bounty" were and how the changes would legally affect them, (3) "whether non-relative beneficiaries would be excluded or included," and (4) whether the grantor had "knowledge of who control[led] his finances and business and by what method, and if controlled by another, how dependent [wa]s the grantor/testator on him and how susceptible to his influence."[23]  The Supreme Court of Mississippi has instructed that "the testator/grantor should give a thoughtful deliberation to all of these factors.  No set amount of time is stated as required, but a positive factor to overcome the undue influence presumption is a mature and thoughtful weighing of the legal consequences of a grantor/testator's action."[24]

As to the first factor, there is evidence in the record that Don had some awareness of the value of his total assets; Lackland testified that Don stopped by the bank periodically to discuss his accounts and their balances.  As to the second factor, Lackland testified that, in his view, Don was confident and

---

[21] *See Saucier v. Estate of Saucier*, 908 So. 2d 883, 888 (Miss. Ct. App. 2005) (finding substantial evidence supported a finding of good faith where beneficiary was undisputedly instrumental in will drafting but numerous disinterested persons witnessed signing of will in the open at a bank branch, including bank assistant manager, who testified that testator appeared to be in his right mind).

[22] *See Estate of Holmes*, 961 So. 2d at 680.

[23] *Id.* at 684 (citation omitted) (quoting *Murray*, 446 So. 2d at 579).

[24] *Id.* at 684-85 (citation omitted) (quoting *Murray*, 446 So. 2d at 579).

understood what he was doing when he changed the beneficiary from Ava to Alita and Craig, and Don understood the effect of that change on his finances and the disposition of his assets after his death.  Lackland added that Don stated his intent to take Ava off every account because he thought she was stealing money from him.

As to the third factor, Craig was not a relative of Don's at the time Don filed the initial change-of-beneficiary forms.  Although Alita was also a non-relative at that time, Don was planning to marry her and, in fact, did marry her later that day in a small ceremony.  Finally, as to the fourth factor, Lackland testified that during the August 12 meeting, Don knew Ava was co-owner of his checking accounts and wanted her removed because he believed she was stealing money from him.  Additionally, Don removed Ava and named Craig as the holder of his power of attorney relatively soon after Craig began assisting Don with his finances, shortly after Don suspected Ava was mishandling his money.  This indicates that Don knew who controlled his finances.  In giving Craig his power of attorney, Don was dependent on Craig's assistance and therefore likely to be susceptible to his influence.

Overall, we conclude there is at least a fact issue as to whether Don engaged in a "mature and thoughtful weighing of the legal consequences"[25] of removing Ava as beneficiary of his annuities.    Don was not required under Mississippi law to engage in "thoughtful deliberation" for a "set amount of time" before making these changes.[26]  A fact-finder could conclude that it was not unreasonable for Don to remove Ava, whom he suspected of stealing from him, as a beneficiary; to replace Ava with Don's wife-to-be (Alita); or to list Craig, the holder of his power of attorney, as a contingent beneficiary in the

---

[25] *See id.* at 685 (citation omitted) (quoting *Murray*, 446 So. 2d at 579).
[26] *See id.* at 684 (citation omitted) (quoting *Murray*, 446 So. 2d at 579).

event Alita was unable to receive the funds. Accordingly, the witness testimony is sufficient to create a genuine fact issue as to whether Don acted with knowledge and deliberation.[27]

### Independent Action and Consent

Finally, we reach the question whether Don exhibited independent consent and action.[28] In analyzing this prong, Mississippi courts consider "all of the surrounding facts and circumstances."[29] One way of showing independent consent and action is if the testator acted on the advice of a competent person who was "disconnected from the grantee" and "devoted wholly to the grantor/testator's interest."[30]

Here, there is evidence that Don met with several competent persons who were disconnected from Craig and devoted wholly to Don's interests before completing the initial change-of-beneficiary form for the Great American annuities. First, Don went to Regions on August 12 to discuss his accounts with Lackland, the Regions branch manager, as he had done "periodically" since opening the accounts. At this meeting, Lackland closed several accounts and removed Ava from the remaining accounts. Around this time, Don also met with his long-time attorney, Frank Dudeck. According to Stephen Jones, who worked for Dudeck, Don discussed his retirement funds and where his

---

[27] *See Estate of Hood v. Parker*, 955 So. 2d 943, 945, 947 (Miss. Ct. App. 2007) (finding substantial credible evidence to support finding that grantor acted with knowledge and deliberation in executing deed transferring his home to neighbors (rather than his only child), where grantor was aware that his home was an asset and appeared aware of its general value; was aware that his child was his only beneficiary under prior will and that deed disinherited her (which he had previously stated he would do if she did not agree to certain conditions); was aware that neighbor-grantees were non-relatives whom he was favoring over his family; and shared a joint account with his girlfriend (the mother of one of the neighbor-grantees), who helped him pay his bills but did not control his finances).

[28] *Estate of Holmes*, 961 So. 2d at 680 (quoting *Mullins*, 515 So. 2d at 1193).

[29] *Vega v. Estate of Mullen*, 583 So. 2d 1259, 1264 (Miss. 1991).

[30] *See Estate of Holmes*, 961 So. 2d at 680 (first quoting *Murray*, 446 So. 2d at 578; then quoting *Mullins*, 515 So. 2d at 1193).

retirement distributions were going, and Dudeck "advised [Don] to call the bank" that held those assets.  Then, on August 17, Don signed the change-of-beneficiary forms for the annuities at Regions in front of Lackland.

While it is unclear whether and to what extent Don received "advice" from these advisors, the other surrounding facts and circumstances create at least a fact issue as to whether Don exhibited independent consent and action. Lackland testified that the beneficiary change was Don's idea, that Don was not subject to any undue influence in making that choice, and that Don led the meeting that day.  Moreover, Dr. Rhonda Gentry, Don's physician for his cancer treatment, testified that she believed he had the capacity and understanding to make a beneficiary decision in August 2015, and that she did not have any impression during her treatment of Don that anyone was controlling or subverting his decision-making.  Taken together, we find that all of the surrounding facts and circumstances in this case are sufficient to create a genuine fact issue as to whether Don exhibited independent consent and action.[31]

For these reasons, the witness testimony in this case creates a genuine fact issue as to whether Alita and Craig can rebut the presumption of undue influence.[32]   The undue influence analysis involves witness credibility determinations, and this is therefore an issue for trial.[33]   The district court

---

[31] *See Williams v. Estate of Cheeks*, 961 So. 2d 65, 68-70 (Miss. Ct. App. 2007) (finding that beneficiary showed by clear and convincing evidence that testator exhibited independent consent and action in executing will and trust, where witnesses testified that testator was strong-willed and independent, testator read documents and stated that they expressed her intent, attorney who prepared documents and witnessed their execution testified that testator was competent and sharp, and there was no evidence that testator suffered from any mental handicaps preventing her from acting independently).

[32] *See Anderson,* 477 U.S. at 248 (there is a genuine fact dispute if the evidence could lead "a reasonable jury [to] return a verdict for the nonmoving party").

[33] *See Estate of Johnson*, 237 So. 3d at 714 (quoting *Murray*, 446 So. 2d at 579) ("[A]fter all testimony relating to the [undue influence rebuttal] factors [is] received, it is still to the

No. 18-60091

erred in granting summary judgment in Ava's favor on the basis of undue influence.

## CONCLUSION

For these reasons, we VACATE the district court's summary judgment ruling in Ava's favor and REMAND this case to the district court for trial.[34]

---

trier of fact to judge the credibility of the witnesses and the worth of their testimony." (first alteration in original)).

[34] The issues presented on appeal to this court are undue influence and the proper designation of the beneficiary of the annuities. As discussed above, the district court's rulings on those issues are vacated. Based on the district court's conclusion that the beneficiary changes were invalid, it also granted summary judgment in Ava's favor as to (1) the relief requested in the underlying interpleader complaint, and (2) Alita's crossclaim alleging Ava's wrongful interference with Alita's interest in the annuities. Those two rulings are also vacated and remanded because they relied on a now-vacated ruling. In light of our vacatur of the summary judgment ruling in Ava's favor, we need not reach appellants' additional argument on appeal that the district court improperly relied on hearsay statements in Ava's affidavit in granting her summary judgment motion. The remaining aspects of the district court's summary judgment ruling are not the subject of this appeal and are therefore left intact by this opinion: (1) the denial of Alita and Craig's motion for summary judgment to the extent it sought to establish ownership based on the issue of mental capacity; (2) the dismissal of Ava's crossclaim (and corresponding denial of her summary judgment motion) to the extent the crossclaim implicated assets other than the Great American annuities; and (3) the finding that Ava abandoned her conversion claim.